992 So.2d 283 (2008)
ASSOCIATED LEASING INTERNATIONAL CORP., Appellant,
v.
ALPHA CAPITAL SERVICES, INC., Appellee.
Nos. 4D07-1607, 4D07-3463.
District Court of Appeal of Florida, Fourth District.
September 3, 2008.
Rehearing Denied November 4, 2008.
*284 Stacey D. Mullins of Lavalle, Brown, Ronan & Mullins, P.A., Boca Raton, for appellant.
Amy D. Shield of Amy D. Shield, P.A., Boca Raton, for appellee.
WARNER, J.
Appellant challenges a final judgment in favor of an aircraft broker based upon a jury verdict finding that an implied contract existed under which the broker is now owed damages. It contends that the trial court erred in failing to grant a directed verdict. Because the appellee failed to prove any benefit conferred upon appellee or of which it had knowledge, we agree with appellant and reverse.
Herbert Beck, owner of Jet Travel, a charter jet service, approached appellee John Casserly, an aircraft broker doing business as Alpha Capital, Inc., to help him secure financing for a Lear 55 jet. After being successful, Casserly received a broker's fee. When Jet Travel experienced financial difficulties in 1995, Beck again approached Casserly regarding refinancing the Lear 55. Casserly introduced Beck to appellant Associated Leasing for the purpose of Associated providing the refinancing. Before Associated made any determination, Jet Travel filed for bankruptcy, and Associated was unable to fund the refinancing. It returned the deposit Jet Travel made.
Casserly testified that in order to make the refinancing more attractive, Beck introduced Casserly to Quicksilver, an established charter business. Casserly proposed using its charter business base in financial documents submitted to lenders for the refinancing of the Lear 55. Those documents, however, were prepared by Beck's accountants and submitted to bolster the request for refinancing. Beck relied on Casserly's advice on structuring the financial package.
As soon as Associated turned down the refinancing, Casserly submitted an application to GE Capital, with the various financial documents on Jet Travel and Quicksilver. At the same time, he made several other inquiries to lenders, including Joe Dini at Finova Capital Corporation. However, he did not pitch the transaction to Finova, because he was still dealing with GE Capital. Dini likewise testified that Casserly had informed him of the transaction but only as a backup *285 source of financing. After over a year of working on the refinancing, and Jet Travel's declaring bankruptcy, the Lear 55 was repossessed by its original lender. GE Capital turned down Beck for refinancing. Casserly stopped working on any refinancing at that time, as Beck told him that he was moving back to his home country of Austria.
Sometime later,[1] Beck, now doing business as Quicksilver, contacted Ronald Shane, the president of Associated, and requested assistance with financing two smaller Lear jets. The smaller jets were more in demand for charters because their costs were lower than that of the Lear 55. The cost of the jets themselves was also considerably less expensive. Beck told Shane that he had terminated his relationship with Casserly. Shane did not confirm this with Casserly, as the two had not talked since they negotiated over Associated's involvement over the Lear 55 refinancing.
Shane was a longtime acquaintance of the president of Finova. After Beck contacted Associated, Shane called the president and asked if Finova would be interested in working with Beck. He eventually received a call from Joseph Dini from Finova, and Shane explained Beck's proposal. Beck flew out to see Dini, and later Finova made a proposal which Beck accepted. Associated was kept informed of the negotiations. Although Dini did not want to fund the deal, he received instructions from someone high up in the company to do so. [To be specific, Dini did not want to fund the second deal (the Lear 36 deal)the Lear 35 transaction occurred one year prior. Dini testified "I was uncomfortable about doing a second deal because we had already approved and done a first transaction for a Lear 35 and I felt that this was an over-extension."] He testified that he recognized Associated as the broker as Associated had brought Beck's transaction to Finova for financing. A commission was paid by Finova to Associated in connection with the financing transaction. He expected that if another broker was involved with the transaction they would work out any commission split between them.
Finova's file on the transaction contained the documents prepared when the Lear 55 transaction was submitted to GE Capital. These were delivered to Finova by the loan officer at GE Capital apparently sometime around the time GE Capital turned down the refinancing of the Lear 55. Associated did not submit these documents to Finova. Nor was there testimony that Finova relied on these summaries in making its decision to fund the Lear 35 transaction.
In his testimony, Dini explained that aircraft financing transactions can evolve over time and one aircraft can be substituted for another when, for instance, an aircraft is sold to another while a purchaser's financing is still being worked out. More often, name changes of the entity taking possession of the aircraft occur. Dini did not testify that he considered the financing of the Lear 35 and Lear 36 as part of the same transaction as the refinancing of the Lear 55.
Casserly sued Associated for commissions on both the Lear 35 and Lear 36 transactions under an implied contract theory, claiming that Casserly had conferred a benefit on Associated of which Associated knew, and Associated had kept that *286 benefit. He alleged that it would be inequitable for Associated to keep the benefit because Casserly was the procuring cause of the commission. Associated moved for a directed verdict at the close of Casserly's case, as well as at the close of all the evidence. It maintained that Casserly had failed to prove that he had conferred a benefit on Associated or that Associated knew of it. The trial court denied the motion, and the jury returned a verdict in favor of Casserly. The court entered final judgment on the verdict, and this appeal followed.
"A contract implied in law, or `quasi-contract,' operates when there is no contract `to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation.'" Ocean Commc'ns, Inc. v. Bubeck, 956 So.2d 1222, 1225 (Fla. 4th DCA 2007) (quoting Commerce P'ship. 8098 Ltd. P'ship v. Equity Contracting Co., 695 So.2d 383, 386 (Fla. 4th DCA 1997)). To prevail on such a theory, the plaintiff (here, Casserly) must prove by a preponderance of the evidence that: 1) he conferred a benefit on Associated; 2) Associated has knowledge of the benefit; 3) Associated voluntarily accepted or retained the benefit conferred; and 4) the circumstances are such that it would be inequitable for Associated to retain the benefit without paying fair value to Casserly. Hull & Co., Inc. v. Thomas, 834 So.2d 904, 907 (Fla. 4th DCA 2003).
Casserly contends that he conferred a benefit upon Associated by introducing it to Beck and preparing the documents found in Finova's file in connection with Finova's financing of the two Lear aircrafts. Neither constitutes a benefit conferred on Associated under the facts of this case.
With respect to the documents found in Finova's file, these were spreadsheets prepared by Beck's accountants with assistance from Casserly as well as handwritten answers to questions submitted by GE Capital regarding various aspects of the Lear 55 refinancing. The effort of Casserly in compiling this documentation for the Lear 55 refinancing was not a benefit Casserly conferred on Associated. Casserly did this for the benefit of GE Capital and Beck in order to close the refinancing transaction. In fact, there was no evidence that this information was even used by Finova to approve the entirely different arrangement of financing for the two smaller jets, which goes without saying would require entirely different projections of income production in order to justify financing decisions. Thus, the evidence does not even show that the documentation compiled by Casserly constituted a benefit to anyone in the other transactions.
Nor does the introduction of Beck to Associated for purposes of obtaining refinancing of the Lear 55 confer a benefit upon Associated in connection with the financing of the Lear 35 and Lear 36 jets. Even with the testimony from Dini, there was no evidence that the refinancing of the lease on the Lear 55 was the same transaction as the financing of the purchase of the two smaller jets. The financial institution, the one receiving the benefit of the financing deal, is obligated to pay the commission to the financing broker, and Finova recognized Associated as the broker which brought it the Lear 35 financing, not Casserly. Even as to the Lear 55 transaction, both Casserly and Dini testified that Casserly did not "pitch" the Lear 55 transaction to Dini, the only transaction on which Casserly worked. Finova had been contacted merely as a possible backup for that transaction. Although Dini testified at length about the way that an aircraft deal *287 can change from the type of aircraft or the corporate structure in place to purchase the plane, that is not the same as expecting a broker's commission for a deal never even presented to the lender. Dini did not testify that he considered the Lear 35 and Lear 36 transaction as part of the same transaction as the Lear 55 refinancing such that Finova was obligated to pay a commission to Casserly. Second, Casserly did not present evidence that Associated was aware of the "benefit" of the introduction of Beck. Casserly had introduced Beck to Associated in the hopes of Associated's refinancing the Lear 55 transaction. Thus, Associated's contact was as a lender, not a broker. Further, without contradiction in the evidence, Shane testified that Beck told him that he had terminated his relationship with Casserly and had sent him a termination letter. Beck confirmed that he had ended his relationship with Casserly.
In short, there was no evidence from which a theory of a contract implied in law could be shown as against Associated. Casserly may have had a cause of action against Finova or Beck for failing to pay a commission or cutting him out of further negotiations. He did not prove that Associated was liable under an implied contract theory. He has cited to us no case in which a broker has been held liable to another broker on a theory of an implied contract under these circumstances or similar ones, and we have found none ourselves.
We reverse the final judgment and remand for entry of a judgment for the defendants.
KLEIN, J. and FLORES, MARY BARZEE, Associate Judge, concur.
NOTES
[1] Casserly testified that he terminated his efforts in May of 1996. Ronald Shane testified that he was contacted by Beck in July 1996. However, that was approximately six months after Associated refused to fund the refinancing of the Lear 55. There was also evidence that Associated had done a credit check on Beck in April of 1996.